IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


WILLIAM LAMONT HUDSON,     )
                                )
              Plaintiff,     )
                                )
      vs.                    )       Civil Action No. 07-1115
                                )       Judge David S. Cercone/
DETECTIVE MARK GOOB, Zone #3   )       Magistrate Judge Amy Reynolds Hay
Pittsburgh Police Dept Southside, et al.,  )
                                )
            Defendants.   )    RE:    Dkt. [51]


<u>REPORT AND RECOMMENDATION</u>

<u>RECOMMENDATION</u>

      It is respectfully recommended that the Defendants' motion for summary judgment be granted.

<u>REPORT</u>

      William Lamont Hudson (Plaintiff) has filed a civil rights action against nine Pittsburgh City Police officers, alleging that the police officers utilized excessive force in effectuating Plaintiff's arrest and thereby violated Plaintiff's constitutional rights.  Because the summary judgment record reveals no material factual dispute as to whether the force used was excessive, the Defendants are entitled to summary judgment.  In the alternative, because the Defendants are all entitled to qualified immunity, summary judgment should be entered in favor of the Defendants.

**Relevant Procedural History**

      Plaintiff, who at the time of instituting this civil rights action was a prisoner at the Allegheny County Jail, is proceeding as a pauper.  Dkt. [11].  The operative complaint is Dkt. [17].  All the Defendants, represented by the same attorney, filed a motion for summary

judgment, Dkt. [51], a brief in support, Dkt. [52], and exhibits in support, Dkt. [53]. The court

ordered Plaintiff to file a response. Dkt. [54]. Rather than filing a response to the summary

judgment motion, Plaintiff filed a motion to compel the Defendants to comply with Local Rule

56.1 by filing a concise statement of material facts. Dkt. [55]. The court ordered the Defendants

to respond to that motion, Dkt. [56], and their response took the form of filing a concise

statement. Thereafter, the court ordered Plaintiff to file his concise statement of material facts.

Dkt. [59]. Plaintiff, who apparently had not yet received the Defendants' concise statement,

executed a motion for sanctions for the Defendants' purported violation of the court's order

directing a response. Dkt. [60]. The court denied the motion for sanctions as moot, given the

Defendants' compliance. Dkt. [61].

Next, Plaintiff filed something captioned "Memorandum Order." Dkt. [62]. In that

filing Plaintiff represented for the first time in this litigation that "he cannot oppose or appeal or

further litigate simply for Plaintiff has never received (1) single motion or response from

Defendants' attorney/and or Defendants period." Dkt. [62] at 2. The court notes however, that

not only was the summary judgment motion and brief accompanied by certificates of service

indicating that they were sent to Plaintiff at the Allegheny County Jail via first class mail, but

Plaintiff must have received the summary judgment motion and brief because how else could he

have known that the motion was not accompanied by the required concise statement of material

facts. See, e.g., Dkt. [62] at 1 ("Defendants failed to comply with local Rules 56.1 which

requires that a concise statement of material facts accompany a motion for summary judgment.

No such concise statement accompanied Defendants' motion for summary judgment Dkt. [51].").

Thus, it appears that Plaintiff received the Defendants' summary judgment motion and noticed

that it was not accompanied by the concise statement. Because Plaintiff's representation that he

never received any single motion is affirmatively rebutted by the record, indeed rebutted by Plaintiff's very own words and actions, the court does not credit Plaintiff's unsworn statement that he never received a single motion from the Defendants' attorney.

Plaintiff eventually filed his concise statement of material facts. Dkt. [66]. The court ordered the Defendants to produce the transcripts of Plaintiff's guilty plea transcripts, wherein he pleaded guilty to resisting arrest, 18 Pa.C.S.A. § 5104,[1] taunting a police animal, 18 Pa. C.S. 5511.2(a)[2] and tampering with physical evidence, 18 Pa.C.S. § 4910.[3]   The Defendants complied. Dkt. [73].

### Summary Judgment Standard

Summary Judgment is appropriate only where there are no genuine issues of material fact. Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the

---

[1]  18 Pa.C.S.A. § 5104 provides that

A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

[2]  18 Pa.C.S.A. 5511.2(a)  provides that

(a) Illegal to taunt police animals.--It shall be unlawful for any person to willfully or maliciously taunt, torment, tease, beat, kick or strike a police animal. Any person who violates any of the provisions of this subsection commits a felony of the third degree.

[3]  18 Pa.C.S.A § 4910 provides in relevant part that

A person commits a misdemeanor of the second degree if, believing that an official proceeding or investigation is pending or about to be instituted, he:

    (1) alters, destroys, conceals or removes any record, document or  thing with intent to impair its verity or availability in such proceeding or investigation; or. . . .

non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In other words, if the evidence, however, is "'merely colorable' or is 'not significantly probative,'" summary judgment may, nonetheless, be granted."  Equimark Commercial Fin. Co. v. C.I.T. Fin. Serv. Corp., 812 F.2d 141, 144 (3d Cir.1987) (quoting Anderson, 477 U.S. at 249-50).

In evaluating the evidence, the court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.  The burden of establishing that no genuine issue of material fact exists rests with the movant. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter but, rather, to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  When examining the record before it to see if there are any genuine issues of material fact, the court's focus is on issue-finding, not on issue-resolution.  With this standard in mind, the court turns to the record.

### The Complaint and Summary Judgment Record

The operative complaint, Dkt. [17], alleged the use of excessive force by the arresting officers.  The court takes judicial notice[4] of the dockets of the Allegheny County Court of

---

[4] In disposing of a motion for summary judgment, a court may sua sponte take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  See, e.g., In re Brooklyn Navy Yard Asbestos Litigation, 971 F.2d 831, 839 (2d Cir. 1992)("any facts subject to judicial notice may be properly considered in a motion for summary judgment"); St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1171-72 (10th Cir. 1979)("a district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial. Thus, a court may . . . take judicial notice, whether requested or not. . . ) (citations omitted); Mid-South Grizzlies v. National Football League, 550 F.Supp. 558, 570 n. 31 (E.D. Pa. 1982)("Judicial notice may be used in resolving a motion for summary judgment."), aff'd, 720 F.2d 772 (3d Cir. 1983).

Common Pleas[5] which reveals the fact that Plaintiff was found guilty of resisting arrest, taunting/attacking a police animal, and tampering with evidence in connection with the events that give rise to the instant suit.

**Discussion**

**Fourth Amendment Excessive Force Claims**

Plaintiff can only make a Fourth Amendment claim of excessive force given that the force being used was used in the course of an arrest. The Supreme Court has held that "*all* claims that law officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" Graham v. Connor, 490 U.S. 386, 395 (1989). Hence, to the extent that Plaintiff is attempting to make an Eighth Amendment claim or a claim under the more generalized "shocks the conscience" or other similar open-ended standard of substantive due process, see Dkt. [17] at 7, ¶ 1, he may not do so under Graham.[6] The analysis of reasonableness under the Fourth Amendment standard requires a "careful balancing of the nature and quality of

---

[5] The Common Pleas docket of Plaintiff's criminal conviction at issue in this case, i.e., Commonwealth v. Hudson, CP-02-CR-0007586-2006 (Allegheny County Com. Pl.), may be found at:

  http://ujsportal.pacourts.us/DocketSheets/CPReport.aspx?matterID=200274749

[6] Technically the Fourth Amendment applies to state actors, as all of the Defendants herein are, by means of the Fourteenth Amendment and the selective incorporation doctrine. Knox County Educ. Ass'n v. Knox County Bd. of Educ., 158 F.3d 361, 371 n.9 (6th Cir. 1998) ("The Fourth Amendment, although initially applicable only to the federal government, is now applicable to states as well by virtue of selective incorporation through the Fourteenth Amendment.")(citing Schmerber v. California, 384 U.S. 757 (1966)); Kerr v. City of West Palm Beach, 875 F.2d 1546, 1548 n.4 (11th Cir. 1989 )("By its own terms, the fourth amendment protects the citizenry only against unlawful actions by federal officials; the due process clause of the fourteenth amendment to the Constitution, however, incorporates the guarantees of the fourth amendment with regard to unlawful actions by state and municipal actors.")(citing Wolf v. Colorado, 338 U.S. 25, 27-28 (1949)). Hence, we will use the phrase "Fourth Amendment" as a short hand way of expressing the concept that the Fourth Amendment **standards** are applicable herein as incorporated into the substantive due process clause of the Fourteenth Amendment.

the intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake." Id. at 396 (internal quotations omitted). The "right to make an

arrest or investigatory stop necessarily carries with it the right to use some degree of physical

coercion or threat to effect it." Id. In Graham, the defining case in the area of excessive force,

the Supreme Court held that

> the "[t]est of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical applications," Bell v. Wolfish, 441 U.S. 520, 559 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case including . . . whether he [the suspect] is actively resisting arrest or attempting to evade arrest by flight. . . .
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness applies: "Not every push or shove even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving– about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Graham, 490 U.S. at 396 -97 (some citations omitted). Accord Hudson v. Coxon, 149 Fed.

Appx. 118, 121 (3d Cir. 2005)("The standard is one of reasonableness, which assesses the

circumstances from the perspective of a reasonable officer on the scene. ")(internal quotations

omitted). Moreover, it is the Plaintiff's burden to show that the use of force was excessive. See,

e.g., Huang v. Harris County, 264 F.3d 1141 (Table), 2001 WL 822534, at *9 (5th Cir.

2001)("To succeed on an excessive-force claim under the Fourth Amendment, the plaintiff bears

the burden of showing: '(1) an injury (2) which resulted directly and only from the use of force

that was clearly excessive to the need and (3) the force used was objectively unreasonable.'"). With these standards in mind, the court considers the Defendants' summary judgment motion.

The summary judgment record viewed in a light most favorable to Plaintiff reveals that Plaintiff, "with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, create[d] a substantial risk of bodily injury to the public servant or anyone else, or employ[ed] means justifying or requiring substantial force to overcome the resistance." 18 Pa.C.S.A. § 5104. The record further conclusively establishes that Plaintiff "willfully or maliciously taunt[ed], torment[ed], tease[d], beat, kick[ed] or str[uc]k a police animal." 18 Pa. C.S. 5511.2(a). The record also establishes that Plaintiff, "believing that an official proceeding or investigation is pending or about to be instituted, . . . alter[ed], destroy[ed], conceal[ed] or remove[d] any record, document or thing with intent to impair its verity or availability in such proceeding or investigation[.]" 18 Pa.C.S. § 4910.[7]

Moreover, under Pennsylvania law, in order for a plea of guilty to be accepted by the judge, the plea must be accepted in open court and a colloquy must take place on the record. See, e.g., Commonwealth v. Morrison, 878 A.2d 102, 107 (Pa.Super. 2005)("A valid plea colloquy

---

[7] Defendants seem to argue that Plaintiff's mere convictions, especially the conviction for resisting arrest, estop him from even possibly making an excessive force claim. See Dkt. [52] at 4 to 5. However, that is not the law. See, e.g., Nelson v. Jashurek, 109 F.3d 142, 145 (3d Cir. 1997)(essentially reasoning that the being convicted of a crime which requires that the police officer use substantial force to effectuate the arrest, as is the case with the crime of resisting arrest, does not thereby render all the force used by the officer reasonable for Fourth Amendment purposes. In other words there could be substantial force that is reasonable and substantial force that is unreasonable). See also Perlleshi v. County of Westchester, No. 98 CIV. 6927, 2000 WL 554294, at *5 (S.D.N.Y. April 24, 2000)("The fact that Perlleshi has admitted to resisting arrest is not automatically dispositive of his claim that Repicky's conduct constituted excessive force. The specific issue before the Court on the excessive force claim, is whether Repicky-who admits to throwing at least one punch at Perlleshi-engaged in more force than was necessary, under the 'objective reasonableness test,' to subdue Perlleshi and effect the arrest."). It is not the mere fact of the conviction, rather, it is the underlying facts of the conviction as evidenced by the plea colloquy that provides a basis for estopping the Plaintiff from denying specific facts he admitted at the guilty plea colloquy.

must delve into six areas: 1) the nature of the charges, 2) the factual basis for the plea, 3) the right to a jury trial, 4) the presumption of innocence, 5) the sentencing ranges, and 6) the plea court's power to deviate from any recommended sentence.")(citing, inter alia, Comment to Pa.R.Crim.P. 590(A)(2)).  However, under Pennsylvania law, the factual basis for the plea of guilty to the crimes may be stipulated to by the criminal defendant.  See, e.g., Commonwealth v. Porter, 382 A.2d 1199, 1200 (Pa. 1978)("After a stipulation of facts had been agreed to by all parties, appellant entered a plea of guilty and was adjudged guilty of murder of the third degree and sentenced to a term of imprisonment of not less than five nor more than ten years.  In this direct appeal, appellant argues that the stipulated evidence is insufficient to provide a factual basis for a finding of murder and contends that the highest degree of culpability appropriate under the asserted facts would be the crime of involuntary manslaughter.  We have considered these arguments and find them to be without merit.");  Commonwealth v. Kirsch, 930 A.2d 1282, 1286 n.4 (Pa. Super. 2007)("Randolph stipulated that the affidavit of probable cause could be accepted as a factual basis for the plea as to each charge."); Commonwealth v. Fluharty, 632 A.2d 312, 316 (Pa.Super. 1993)("At appellant's guilty plea hearing it was stipulated by and between counsel that the affidavit of probable cause, which was contained in the criminal complaint filed against appellant, would serve as the factual basis for the pleas of guilty."); Commonwealth v. Scott, 414 A.2d 388, 391 (Pa.Super. 1979)("the court's statement of the law was made in contemplation of the agreement by counsel that the factual basis for the plea would be established by stipulation").

Instantly, that is what happened at Plaintiff's guilty plea colloquy; Plaintiff stipulated to the factual basis of the crimes charged.  During his plea colloquy, Plaintiff's counsel in open court stipulated as follows: "I would move for admission into evidence the affidavit of probable

cause as well as the police report, [and] would further stipulate that the facts as stated therein are sufficient to establish the defendant's guilt beyond a reasonable doubt." Dkt. [73]. Accordingly, Plaintiff stipulated to the following facts:

On 4/5/06 Det. Fallert and myself (Emery) were conducting surveillance in the area of Knox Ave and Bausman St due to numerous complaints of open air drug activity[.] Det Fallert and myself were utilizing an undercover vehicle along with night vision and 15x50 power binoculars[.] Det Love, Det Absten and K9 partner "Benny" were in one unmarked police vehicle and Det Goob, Det Lukitsch, Sgt Snyder and Det. Adametz were in another unmarked vehicle to assist in the arrest of offenders[.] We observed a black male (later identified as Hudson, William) exit the passenger side of a white Honda and enter the side door of 133 Bausman St[.] Detectives had made previous arrests from this residence in the past and on this day[.] The white Honda circled the block and parked two vehicles in front of our undercover vehicle[.] The driver exited the vehicle and also entered the side door of 133 Bausman St at 2255 hrs[.] Within five minutes both males exited the residence and walked to the white Honda[.]

At that point Det Fallert notified the take down vehicles to move in on the two actors[.] When Det Love, Det Absten and K9 partner "Benny" approached the two actors, Hudson reached into his left front pants pocket. We observed Hudson pull a large bag of crack cocaine from his left front pants pocket and place the bag into his mouth[.] Det Fallert notified the other Detectives of our observations as they approached Hudson[.] As Det Love exited his unmarked vehicle with his badge displayed on his chest and ordered Hudson to stop, Hudson began to run along side 132 Bausrnan St into the rear yard[.] Det Love gave chase on foot while other Detectives attempted to set up a perimeter[.] Det Love observed Hudson attempt to jump over a wooden picket fence and fall into the fence[.] The fall caused Hudson to strike the top of one picket with his head and the fence broke[.] Hudson fell over the fence and Det Love deployed his Taser, which missed[.] Hudson ran behind 134 Bausman St and jumped over another fence[.] Hudson then ran between 134 Bausman St and 136 Bausman St towards the street[.] Det Goob was in front of 136 Bausman St as Hudson emerged from the houses[.] Hudson attempted to run through Det Goob and Det Goob was unable to gain control of Hudson and he continued to run across Bausman St[.] Det Adametz was able to tackle Hudson to the ground in front of 137 Bausman St

We then exited our unmarked vehicle to assist the other Detectives with the arrest of Hudson[.] Det Adametz was attempting to place handcuffs on Hudson when he began to push off the ground[.] Det Fallert ordered Hudson to stop resisting and he did not comply[.] Hudson was still pushing off the ground and Det Fallert deployed his Taser on Hudson[.] Det Fallert deployed his Taser several times but it did not effect Hudson and he turned to run down Bausman St towards Knox Ave[.] Det Fallert attempted to grab Hudson's right arm and he pulled it free[.] Hudson then swung his right elbow towards Det Fallert and struck him on the forehead above his left eye[.] After the elbow strike, Det. Fallert was able to trip Hudson prior to falling

to the ground from being elbowed[.] Hudson stumbled to his feet and again attempted to run[.]

At that point Det. Adametz deployed his Taser which was effective in stopping Hudson[.] Hudson fell to the ground and began to roll, which caused the wires on the Taser to break making [it] ineffective[.] Det Goob pulled Hudson's left arm behind his back and placed a handcuff on it[.] Hudson kept his left arm under his body and would not place it behind his back[.] Det Fallert gave several command[s] for Hudson to place his hand behind his back and to stop resisting[.] Hudson would not comply and attempted to pull his left arm free[.] I was able to observe the large bag of crack cocaine in Hudson's mouth while he was resisting Det Fallert then gave several drive stuns on Hudson which were not effective[.] Hudson pulled his left arm free and began to swing his arm with the set of handcuffs on his wrist acting as a weapon[.] Det Absten arrived at our location and ordered Hudson to stop resisting or the dog would be released on him[.] Hudson refused to comply and Det Absten released his K9 partner "Benny" onto Hudson[.] "Benny" grabbed onto Hudson's right arm and Hudson punched "Benny" and attempted to choke him with his left arm[.]

Det Absten then kicked Hudson in the shoulder, forcing [him] back to the ground[.] Det Absten repeatedly ordered Hudson to stop fighting the dog and put his hands behind his back[.] Hudson then struck "Benny" with a closed striking [sic] him in the shoulder area[.] Det Absten then kicked Hudson in the torso area and ordered him to stop fighting the dog[.] "Benny" let Hudson's left arm free and bit his right arm which pinned him to the ground[.] Det Goob was able to place Hudson's right wrist into the handcuffs at that time[.]

Sgt Snyder notified radio of our location and Officer injury and called for Medics[.] . . . . Unit 3301 transported Hudson to Southside UPMC for treatment from the Taser use and dog bites[.]

Dkt. [53-3] at 5 (Police Report).

Under the Pennsylvania law of collateral estoppel, Plaintiff would be collaterally estopped from denying these facts, which formed the factual basis of Plaintiff's guilty plea. M.B. ex rel. T.B. v. City of Philadelphia, 128 Fed.Appx. 217, 226 (3d Cir. 2005) ("Furthermore, in Pennsylvania, 'criminal convictions are admissible in civil actions arising from the same operative facts and circumstances [and] these convictions are conclusive evidence of the criminal acts.'") (quoting Stidham v. Millvale Sportsmen's Club, 618 A.2d 945, 952 (Pa.Super. 1993)); Harsh v. Petroll, 840 A.2d 404, 444 (Pa.Cmwlth. 2003) ("Prior criminal convictions are conclusive evidence in subsequent civil actions arising out of the same incidents and concerning the same activity which

was criminally prosecuted in the prior action."),  appeal granted in part by, 580 Pa. 546, 862 A.2d 581 (Pa.2004), aff'd, 584 Pa. 606, 887 A.2d 209 (Pa. 2005); 8 Standard Pennsylvania Practice 2d § 49:21 ("under Pennsylvania law, evidence of a guilty plea by an alleged perpetrator of sexual abuse against a child in foster care was admissible and entitled to preclusive effect on the issue of whether **the acts to which he admitted in his plea** were committed, in an action by the child seeking damages against a foster parent, the perpetrator, and a social services agency and its employees")(emphasis added).

Hence, because Plaintiff would be collaterally estopped from denying these facts in a Pennsylvania state court, he is collaterally estopped from denying or otherwise controverting these facts in this federal court. Allen v. McCurry, 449 U.S. 90, 96 (1980); Anela v. City of Wildwood, 790 F.2d 1063, 1068 (3d Cir.1986) ( "The federal court, in determining the collateral estoppel effect [in a federal court case] of a state court proceeding, should apply the law of the state where the criminal proceeding took place").  Accordingly, for purposes of summary judgment, the court deems these facts to be uncontroverted and, indeed, uncontrovertible. See, e.g., Marche v. Parrachak, CIV. A. 1998-CV-4219, 2000 WL 1507403, at *1 (E.D.Pa. Oct. 10, 2000)("While I view the evidence in a light most favorable to Marche on this summary judgment motion, I am also mindful that Marche has pled guilty to armed bank robbery.  In Marche's guilty plea colloquy, Assistant U.S. Attorney Robert Calo summarized the facts leading up to the bank robbery.  The plea court asked Marche if he disputed or denied the operative facts behind the plea.  As Marche stood by, his attorney answered, "No, no."  Marche does not now, nor could he, deny his role in the bank robbery.  Therefore, I take as true the operative facts underlying the plea . . . .) (citations omitted), aff'd  276 F.3d 578 (3d Cir. 2001) (Table).

Alternatively, the doctrine of judicial estoppel prohibits Plaintiff from controverting these facts. "[J]udicial estoppel is a matter of federal law, not state law," unlike the applicability of collateral estoppel doctrine herein which is governed by Pennsylvania law. Lowery v. Stovall, 92 F.3d 219, 223 n.3 (4th Cir. 1996). The Supreme Court has explained the doctrine as follows:

> [the] purpose [of the judicial estoppel doctrine] is "to protect the integrity of the judicial process," Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. (1982), by "prohibiting parties from deliberately changing positions according to the exigencies of the moment," United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993). See In re Cassidy, 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process."); Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982) (judicial estoppel "protect[s] the essential integrity of the judicial process"); Scarano v. Central R. Co., 203 F.2d 510, 513 (3d Cir. 1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts' " (quoting Stretch v. Watson, 6 N.J.Super. 456, 469, 69 A.2d 596, 603 (1949))). Because the rule is intended to prevent "improper use of judicial machinery," Konstantinidis v. Chen, 626 F.2d 933, 938 (D.C. Cir. 1980), judicial estoppel "is an equitable doctrine invoked by a court at its discretion," Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990) (internal quotation marks and citation omitted).
>
> Courts have observed that "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," Allen, 667 F.2d, at 1166; accord, Lowery v. Stovall, 92 F.3d 219, 223 (4th Cir. 1996); Patriot Cinemas, Inc. v. General Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987). Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," Edwards, 690 F.2d, at 599. Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," United States v. C.I.T. Constr. Inc., 944 F.2d 253, 259 (5th Cir. 1991), and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. See Davis, 156 U.S., at 689; Philadelphia, W., & B.R. Co. v. Howard, 13 How. 307, 335-337, 14 L.Ed. 157 (1851); Scarano, 203 F.2d, at 513 (judicial estoppel forbids use of "intentional self-contradiction ... as a means of obtaining unfair advantage"). . . .

New Hampshire v. Maine, 532 U.S. 742, 749 - 51 (2001)(some citations omitted).

We find, to the extent that Plaintiff would attempt to contradict any of the factual admissions he made, i.e., stipulated to, during his plea colloquy, all three prongs of the judicial estoppel doctrine are met.  See, e.g., Lowery v. Stovall, 92 F.3d 219, 224-25 (4th Cir. 1996) (giving judicial estoppel effect to a prior guilty plea to maliciously attacking an officer in a subsequent Section 1983 suit brought by the criminal defendant who alleged a Fourth Amendment unreasonable seizure claim).  First, if Plaintiff attempts to contradict herein those facts stipulated to at his plea colloquy (and below, we find that he does), he would be clearly inconsistent with the position taken in his plea colloquy and in the position he attempted to take herein.  Second, Plaintiff clearly had the State Court accept his position, i.e., accept his plea and in fact, if the State Court was not convinced by Plaintiff's plea that there was a factual basis for it, the State Court was required under State law to have rejected the guilty plea.  Commonwealth v. Maddox, 300 A.2d 503, 505 (Pa. 1973)("It is clear that before accepting a plea of guilty, the trial court must satisfy itself that there is a factual basis for the plea.");  Commonwealth v. Thompson, 448 A.2d 74, 75 (Pa.Super. 1982) ("A factual basis for the plea is universally required.");  Mayberry v. Somner, 480 F.Supp. 833, 839 (E.D.Pa. 1979)("There is an even stronger basis for concluding that Mayberry is estopped in this action. At the time Mayberry entered the plea to the charges, Pennsylvania law required that the court accepting the plea satisfy itself that there was a sufficient factual basis for it.").  Third, if we permitted Plaintiff to assert a position herein that would have contradicted his position in the plea colloquy, he clearly would have derived an unfair advantage.  It appears that in exchange for his plea, the most serious charge against Plaintiff, i.e., aggravated assault was withdrawn and, in addition, he was given a very lenient sentence in light of the actions he took at the time of the arrest.  Accordingly, Plaintiff is judicially estopped from adopting a position herein that would contradict the factual

basis of his plea to which he necessarily had to stipulate, in the State Courts for the plea to have a proper factual basis and consequently for the State Court to have accepted it under State law.

With the foregoing principles in mind we consider the summary judgment record. Given that the Defendants pointed out the lack of evidence to support Plaintiff's Fourth Amendment excessive force claim, the burden then shifted to Plaintiff to come forward to show what evidence that does not contradict the facts which he is estopped from denying, the jury could rely on to find for him. Plaintiff responded with no evidentiary materials whatsoever after the summary judgment motion was filed by the Defendants. He did file a concise statement of material facts, which was not sworn to.[8] Dkt. [66]. Hence, the only evidence of record in opposition to the summary judgment motion that we have is Plaintiff's complaint, which was signed under penalty of perjury. Dkt. [17] at 3 & 11. See, e.g., Paters v. United States, 159 F.3d 1043, 1052 (7th 1998)("**a verified complaint . . . would have the same force and effect as an affidavit...**") (quoting Williams v. Browman, 981 F.2d 901, 905 (6th Cir. 1992)(emphasis added by the Paters court); Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)."). Here, however, the allegations of that complaint, which are not contradicted by the facts stipulated to by Plaintiff at his plea colloquy, simply are insufficient to permit a jury to find that the use of the force described by Plaintiff in his complaint was objectively unreasonable.

---

[8] See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n. 17 (1970) ("This statement, being unsworn, does not meet the requirements of Fed.Rule Civ.Proc. 56(e)"); Chaiken v. VV Publishing Corp., 119 F.3d 1018, 1033 (2d Cir. 1997)("Moreover, their unsworn letters do not satisfy the requirements of Fed.R.Civ.P. 56(e) and therefore cannot defeat VV's motion for summary judgment."), cert. denied, 522 U.S. 1149 (1998).

Plaintiff alleged in that sworn complaint that just as the unmarked police cars arrived at the scene and the police were getting out of their vehicles shouting, immediately prior to Plaintiff fleeing, he was in fear of his life and that he ran a short distance, not knowing that the people in the car were police. However, he clearly knew that the people were police given that he stipulated to the fact that when he was approached by Detective Love and Absten and the police dog, Plaintiff "reached into his left front pants pocket . . . . pull[ed] a large bag of crack cocaine from his left front pants pocket and plac[ed] the bag in his mouth," Dkt. [53-3] at 5, a clear effort to hide or dispose of incriminating evidence. If he did not believe they were police, this action of attempting to destroy evidence would be incomprehensible. Given that he pleaded guilty to tampering with evidence, an element of which is "believing that an official proceeding or investigation is pending or about to be instituted, he . . . alter[ed], destroy[ed], conceal[ed] or remove[d] any record, document or thing with intent to impair its verity or availability in such proceeding or investigation[,]." 18 Pa.C.S. § 4910, Plaintiff is estopped from denying that he knew the people approaching him were police when he put the bag of crack cocaine in his mouth. He further stipulated to the fact that "As Det Love exited his unmarked vehicle with **his badge displayed on his chest** and ordered Hudson to stop, Hudson began to run." Id. (Emphasis added). Given that Plaintiff pleaded guilty to resisting arrest, an element of which is "with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty," he is estopped from averring now that he was "unknowingly being pursued by detective(s)." Dkt. [17] at 7, ¶ 3. Mayberry v. Somner, 480 F.Supp. 833, 839 (E.D.Pa. 1979)("There is an even stronger basis for concluding that Mayberry is estopped in this action. At the time Mayberry entered the plea to the charges, Pennsylvania law required that the court accepting the plea satisfy itself that there was a sufficient factual basis for it. At the hearing at which Mayberry entered the

plea, the prosecutor set forth the following as its factual basis. . . . This extensive inquiry by the court into the factual basis for Mayberry's plea removes all possible doubt that the plea constituted an admission by him that he instigated the incident in which defendant Somner was injured. Accordingly, I conclude that Mayberry is collaterally estopped from raising claims alleging a deprivation of his civil rights on the basis of the events that transpired on January 21, 1974.")(citations omitted).

Plaintiff admits that while he fled from the police, he attempted to jump a fence. Dkt. [17] at 7, ¶ 3. Plaintiff further avers that while fleeing, and in mid flight of the attempted jump over the fence, he was allegedly tasered by a pursuing detective. Dkt. [17] at 8, ¶ 3. However, again, he is estopped from averring this because in the stipulation, he agreed that he "attempt[ed] to jump over a wooden picket fence and [he] f[e]ll into the fence and Det Love deployed his Taser, **which missed**[.]" Dkt. [53-3] at 5 (emphasis added).

Plaintiff next avers that after he gets back on his feet after the fall, he "hysterically trots in a state of panic across a yard to the next fence and is tasered again by pursuing Detectives." Dkt. [17] at 8, ¶ 4. However, Plaintiff is estopped from averring that he was actually tasered by Detectives because Plaintiff stipulated that he was not tasered until after he was brought down to the ground by Detective Adametz, who tackled Plaintiff as he was fleeing. Dkt. [53-3] at 5 ("Det Adametz was able to tackle Hudson to the ground in front of 137 Bausman St. . . . Det Adametz was attempting to place handcuffs on Hudson when he began to push off the ground[.] Det Fallert ordered Hudson to stop resisting and he did not comply[.] Hudson was still pushing off the ground and Det Fallert deployed his Taser on Hudson[.]"). That the Defendants were using force and even kicking Plaintiff and choking Plaintiff and punching Plaintiff at this point cannot be considered excessive as the version of the events that Plaintiff is estopped from denying has

him resisting with great force the attempt of the Detectives to gain control of him, despite their repeated orders to him to stop resisting. That the use of force was objectively reasonable is made quite clear by the sworn statements of Detective Adametz who stated that Mr. Hudson "stated to me that he was high on crack cocaine. I've fought other people that were high on crack cocaine and they were typical crack cocaine users. Thin, undernourished. This man [i.e., Plaintiff] was like a body guard. His arms were enormous. He was scary because he was like someone that was much stronger than most of us . . . ." Dkt. [53-3] at 25.

Plaintiff next avers that he was repeatedly assaulted, kicked, punched and tasered over and over. However, Plaintiff stipulated that when Detective Adametz had Plaintiff on the ground and was attempting to get handcuffs onto Plaintiff, "he [i.e., Plaintiff] began to push off the ground[.] Det Fallert ordered Hudson to stop resisting and he did not comply[.] Hudson was still pushing off the ground and Det Fallert deployed his Taser on Hudson[.] Det Fallert deployed his Taser several times but it did not effect Hudson and he turned to run down Bausman St towards Knox Ave[.] Det Fallert attempted to grab Hudson's right arm and he pulled it free[.] Hudson then swung his right elbow towards Det Fallert and struck him on the forehead above his left eye[.] After the elbow strike, Det. Fallert was able to trip Hudson prior to falling to the ground from being elbowed[.] Hudson stumbled to his feet and again attempted to run[.] At that point Det. Adametz deployed his Taser which was effective in stopping Hudson[.] Hudson fell to the ground and began to roll, which caused the wires on the Taser to break making [it] ineffective[.]" Thus far, no use of force against the Plaintiff can be said to support a reasonable jury in finding the force used was excessive.

Plaintiff next avers that he "layed [sic] on the ground in handcuffs as K-9 was allowed to

maul" him. Dkt. [17] at 9, ¶ 7. Contradictorily, Plaintiff stipulated that after he was tasered by

Detective Adametz and he rolled on the ground so as to break the wire leads to the taser,

> Det Goob pulled Hudson's left arm behind his back and placed a handcuff on it[.]
> Hudson kept his left arm under his body and would not place it behind his back[.]
> Det Fallert gave several command[s] for Hudson to place his hand behind his back
> and to stop resisting[.] Hudson would not comply and attempted to pull his left arm
> free[.] I was able to observe the large bag of crack cocaine in Hudson's mouth while
> he was resisting Det Fallert then gave several drive stuns on Hudson which were not
> effective[.] Hudson pulled his left arm free and began to swing his arm with the set
> of handcuffs on his wrist acting as a weapon[.] Det Absten arrived at our location
> and ordered Hudson to stop resisting or the dog would be released on him[.] Hudson
> refused to comply and Det Absten released his K9 partner "Benny" onto Hudson[.]
>  "Benny" grabbed onto Hudson's right arm and Hudson punched "Benny" and
> attempted to choke him with his left arm[.]

Dkt. [53-3] at 5. Thus, unlike what Plaintiff said in his complaint, he was not lying on the

ground at the time in handcuffs, i.e., meaning both hands in cuffs, when the dog was released

onto Plaintiff. Rather, Plaintiff was actively resisting at the time the dog was released.

Plaintiff also avers that he was on the ground and was "ordered to stand up but was

unable to due to being tasered excessively." Dkt. [17] at 10, ¶ 8. Lastly, Plaintiff avers that after

being ordered to get up and not doing so, "[t]hen, Detective(s) placed a gun to Plaintiff's head

continuously threatening Plaintiff to get the [ _ _ _ _ ] up" and that the Detectives were using

racial epithets. Id., at 10, ¶ 9. Plaintiff clarifies that it was only Detective Lukitsch, who used the

gun to threaten Plaintiff. Dkt. [17] at 2, ¶ IV.C. The court notes that there is no mention of the

use of a gun in the police report. In light of the lack of corroborating evidence concerning the

alleged use of a gun, Plaintiff's claim is doubtful at best, but given that this is summary

judgment, and the stipulated facts do not contradict this particular allegation of the use of a gun,

we will credit Plaintiff's version. Even so, while a close call, we nevertheless find that given

Plaintiff's size, strength and uncanny invulnerability to several taser stuns, and his forceful,

violent resistance to both the police and to the dog, and perceived disobedience to the order to stand up, the alleged use of the gun by Detective Lukitsch was not objectively unreasonable given what Detectives could have reasonably perceived as Plaintiff's continued unwillingness to comply with lawful orders and as the potential threat Plaintiff posed, given his size and strength.

Even if, however, such use of the gun was unreasonable and constituted a violation of the Fourth Amendment, we find, as explained more fully below, that under the peculiar circumstances of this case, such use of the gun would be covered by qualified immunity for Detective LuKitsch. See, e.g., Pikel v. Garrett, 55 Fed.Appx. 29 (3d Cir. 2002) (Law enforcement agents conducting search of workplace in 1996 as part of drug investigation were reasonable in their belief that their actions did not violate clearly established law when they used drawn guns, handcuffed employees, and pushed one employee to the ground and pointed a gun at his ear after he failed to respond to an order to get down, and thus, the agents were entitled to qualified immunity from the employees' § 1983 claims arising out of the agents' alleged use of excessive force); Bybee v. Erath, Slip Copy, 2008 WL 5342107, at *2 (9th Cir. Dec. 22, 2008) (Non-precedential) ("Even if the Merediths were able to prove that in July of 1998 the agents used excessive force by pointing guns at them with no reasonable indication of danger, the agents are entitled to qualified immunity because this constitutional violation was not clearly established until our 2002 decision in Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002)."); Blackmore v. City of Phoenix, 126 Fed.Appx. 778, 782 (9th Cir. 2005)("Blackmore testified in his deposition that an unidentified police officer pointed a shotgun at his head after he was already handcuffed and was unarmed. Yet Blackmore cannot prevail on his claim that the officer who pointed a shotgun at his head violated a clearly established right. This circuit had not clearly established that pointing a firearm at an unarmed suspect's head who posed no immediate risk to

the safety of the officers or others was a use of excessive force until the decision in Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002) (en banc)").   In contrast here, a reasonable officer could believe that Plaintiff's continued non-compliance with the order to stand up, as well as Plaintiff's great size and strength and apparent intermittent invulnerability to taser stuns as well as Plaintiff's penchant for running away, posed a danger from Plaintiff that could not be met adequately else wise.  Cf.  Gaddis ex rel. Gaddis v. Redford Tp., 364 F.3d 763, 774 (6th Cir. 2004) ("officer entitled to qualified immunity despite his using Taser gun multiple times on knife-wielding suspect who was no longer an immediate threat; noting that officer's 'actions were intended to avoid having to resort to lethal force'").

Plaintiff also alleges that the Defendants engaged in the use of racial epithets and verbal threats and verbal abuse.  The rule is that if the physical force used is not itself excessive, i.e., is reasonable, then, merely adding verbal threats or racial epithets cannot transform an otherwise non excessive use of force into an unconstitutional use of excessive force.  See, e.g., Johnson v. City of Ecorse, 137 F.Supp.2d 886, 892 (E.D.Mich. 2001)("Policemen's use of slurs and racial epithets is not a search or seizure, and thus cannot sink to the level of violating the Fourth Amendment's prohibition of excessive force.");  Williams v. Belknap, 154 F.Supp.2d 1069, 1072, n.1 (E.D.Mich. 2001)("A policeman's taunting, however, cannot violate the Fourth Amendment.");  Thompson v. City of Galveston, 979 F.Supp. 504, 509 (S.D. Tex. 1997)("claims of excessive force are compensable only to the extent that an injury is caused *directly* by the use of excessive force, not, as alleged here, as having been caused by an alleged use of force in addition to allegations of intimidation and verbal threats.");  Giese v. Wichita Police Dept., 69 F.3d 547 (Table), 1995 WL 634173, *2  (10th Cir. 1995)("Verbal threats during questioning also do not constitute the use of excessive force.").  Having found that no reasonable jury could find

that the force used here was excessive, the addition of verbal threats cannot and does not transform Plaintiff's case into an unconstitutional use of force case.

### Qualified Immunity

In the alternative, even if a reasonable jury could conclude from the evidence presented that any of the foregoing use of force was excessive, we find that notwithstanding this, under the peculiar facts of this case, the officers involved would all be entitled to qualified immunity. The only relief Plaintiff seeks is damages. Dkt. [17] at 3, ¶ VI; id., at 13. Hence, the qualified immunity defense would render summary judgment proper and would completely dispose of the case.

A "government official is entitled to qualified immunity if his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Berg v. County of Allegheny, 219 F.3d 261 (3d Cir. 2000). In "order to survive summary judgment on grounds of qualified immunity, a plaintiff must (1) allege violation of a valid legal right and (2) demonstrate that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Abdullahi v. City of Madison, 423 F.3d 763, 775 (7th Cir. 2005) (quoting Saucier v. Katz, 533 U.S. 194, 201-02 (2001)).[9]

Although in the preceding analysis, the court determined that the Defendants did not violate Plaintiff's Fourth Amendment rights, even if, for the sake of argument, the court assumed such actions on the part of the Defendants did violate Plaintiff's Fourth Amendment rights, Defendants would still be entitled to summary judgment on the basis of qualified immunity

---

[9] Recently, the Supreme Court receded from the qualified immunity rule in Saucier v. Katz, that required the courts to first determine whether a constitutional violation occurred and only then proceed to determine if it would have been clear to a reasonable person that their actions violated clearly established law. Pearson v. Callahan, __ U.S. __, 129 S.Ct. 808 (Jan. 21, 2009).

because it would not have been clear to a reasonable officer that their actions violated Plaintiff's Fourth Amendment rights given Plaintiff's actions, which reasonable officers could have perceived as requiring the amount of force that the summary judgment record reveals was actually utilized. Hence, as an alternative holding, the Defendants are entitled to qualified immunity for all their actions.

Accordingly, the Defendants are entitled to summary judgment either because Plaintiff has failed to carry his burden to show a genuine issue of material fact as to whether the Defendants engaged in excessive force in violation of the Fourth Amendment or because the record conclusively demonstrates that under the facts of this case, the Defendants would all be entitled to qualified immunity.

CONCLUSION

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute waiver of any appellate rights.

Respectfully submitted,

/s/  *Amy Reynolds Hay*
United States Magistrate Judge

Dated:  23 February, 2009

cc:     The Honorable David S. Cercone
        United States District Judge

        William Lamont Hudson
        11844-3-E-124
        Allegheny County Jail
        950 Second Avenue
        Pittsburgh, PA 15219-3100

All counsel of record by Notice of Electronic Filing